UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

MICHAEL SHANE DEATON, INDIVIDUALLY AND
AS EXECUTOR OF THE ESTATE OF JAMES F. DEATON, JR.,
AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES
OF JAMES F. DEATON, JR.                                                                            PLAINTIFFS

V.                                                                            CIVIL ACTION NO. 3:08CV763 DPJ-FKB

MALCOLM MCMILLIN, SHERIFF OF HINDS COUNTY,
MISSISSIPPI, IN HIS OFFICIAL CAPACITY, ET AL.                                     DEFENDANTS

ORDER

This § 1983 action is before the Court on Defendant Dr. Lawrence Sutton's motion for summary judgment [283]. Plaintiffs responded, and the Court, having fully considered the parties' submissions, finds that Sutton's motion for summary judgment should be granted.

I.    Facts and Procedural History

On Friday, December 14, 2007, deputies with the Hinds County Sheriff's Department arrested James F. Deaton, Jr. for being a felon in the possession of a firearm. He was then incarcerated in the Hinds County Detention Center ("HCDC"). Although significant dispute exists regarding the nature and circumstances of the arrest and Deaton's detention, the claims against Dr. Sutton focus on the medical care he provided Deaton on December 17, 2007—the one time he saw the patient. There is no dispute that Deaton was admitted to the hospital the next day in critical condition suffering from renal failure and delirium tremens (DTs). Deaton died December 25, 2007, and Plaintiffs has offered expert testimony that Dr. Sutton's breach of the standard of care caused the death.

Deaton's wrongful-death beneficiaries brought this action under federal and state law. After extensive discovery, Sutton moved for summary judgment, and Plaintiffs conceded all but

their claim premised on 42 U.S.C. § 1983 related to Dr. Sutton's alleged failure to address Deaton's serious medical concerns.  As to that claim, the focus appears to have been further narrowed to address whether Dr. Sutton acted with deliberate indifference in failing to treat Deaton for DTs and for various bruises Plaintiffs believe were caused by the arresting deputies. The Court has personal and subject matter jurisdiction and is prepared to rule.

II.     Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324. Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). In reviewing the evidence, factual controversies are to be resolved in favor

of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

III.     Analysis

Plaintiffs contend that Dr. Sutton violated Deaton's constitutional right to medical care while incarcerated in the HCDC. The standard for making such a claim under § 1983 is well established and requires proof of deliberate indifference. Deliberate indifference is shown when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Thus, deliberate indifference exists "only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citations and internal punctuation omitted).

As for the first prong, it is undisputed that DTs constitute a "serious medical need" which can require hospitalization. *See Thompson v. Upshur Cnty.*, TX, 245 F.3d 447, 457 (5th Cir. 2001); *see also* Sutton Dep. at 24 (agreeing that a patient with "full, complete delirium[ ] tremens" should be hospitalized). In Deaton's case, the medical records from the HCDC reflect that he mentioned DTs two days before Dr. Sutton saw him. Those same records also document that Deaton exhibited some, but not all, of the signs of DTs in his initial hours of detention. And

3

because Dr. Sutton read those records, the Court is satisfied that a jury question exists as to whether Dr. Sutton was subjectively aware of a substantial risk of serious harm. Thus, Plaintiffs survive Dr. Sutton's motion on the first prong of the test as to the DTs. But Plaintiffs have not demonstrated that the injuries associated with the bruises constituted a "substantial risk of serious harm." *Gobert*, 463 F.3d at 346.

The second prong of the deliberate indifference test presents a stiffer challenge to the DTs claim—and to the bruising claim to the extent it could survive the first prong of the test. As an initial point, the Court would readily send this case to the jury on a medical-malpractice claim as there is credible evidence that Dr. Sutton breached the standard of care. But "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id*. (citation omitted). Thus, to establish the second prong of the deliberate indifference test, Plaintiffs must submit evidence that Dr. Sutton "refused to treat [Deaton], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (citation omitted). "Deliberate indifference is an extremely high standard to meet." *Id.* (quotation omitted). The record, though tragic, does not support the finding.

Two days before Dr. Sutton saw him, Deaton mentioned DTs to the medical staff and complained of chills and nausea—both of which *can* be symptoms of alcohol withdrawal. *See* Sutton Dep. at 128. The medical staff addressed the nausea with an antacid and the chills by placing Deaton in a warmer room under observation. He also exhibited high blood pressure and an accelerated pulse. The following day, the vital signs were more stable, although his pulse was

still elevated. There is no record of complaints regarding DTs, and no indication of any disorientation, shakes, vomiting, nausea, or other classic symptoms of the condition.

By the time Dr. Sutton saw Deaton on December 17, he may have had an elevated pulse—a question of fact—but according to Dr. Sutton, Deaton was otherwise stable, and his only request was for blood pressure medicine. Dr. Sutton described Deaton's condition as follows:

> Now, at that point in time, I sat down with Mr. Deaton in my chair right there, and I talked to him. And I asked him was anything else bothering him. He said no. Okay. And that's how I wrote, as noted above. We had a conversation, and what he said was, all I want is my blood pressure medication. Okay. So at that point in time, we talked more. And going through my note, the only thing was, I made sure I got close to him to talk to him about it. Now, the vital signs, when I say they're stable as noted above, his pulse, although I didn't write it, it wasn't 123. It was less than that. . . . Because I checked it. I listened to his heart rate. . . . So if it had been anything different, then I would have changed it. I noted that his blood pressure was okay. Okay. And overall looking at him, he was listening or he didn't hear well. So I spoke to him. I sat him down at the table, in the chair rather, and talked to him. We just candidly – and I asked him again was there anything else that he needed other than his blood pressure. He said no, that's all I need; I just need my blood pressure.

*Id.* at 43-44.

Although Dr. Sutton agreed that Deaton had exhibited certain signs of DTs earlier in his incarceration, Dr. Sutton denied that Deaton exhibited signs of withdrawal when he saw him.

> And with Mr. Deaton, he was observed. Even though he had these signs and symptoms, he was still able to communicate with us and to watch. Now, at what point in time the cascade will go down, nobody knows. But when he came in, from the time from the 15th to the 17th, it's as though, you know, he was stable at that point. Now, from the 17th to that morning, to the 18th, I don't know exactly what happened from the time I saw him. But he was not in the pre-stage or in any tremors. He was very coherent with me. I mean, coherent, and did everything I asked him. And he was very cooperative with myself, as well as the deputy. So he – he didn't have any kind of withdrawal symptoms when I saw him.

5

Sutton Dep. at 57. Significantly, Dr. Sutton offers unrebutted testimony that when he saw Deaton, Deaton exhibit no body tremors, disorientation, agitation, confusion, auditory hallucinations, visual hallucinations, or heart arrhythmias. *Id.* at 128–29. And although he recognized a potential for DTs in Deaton, he maintains that on December 17, Deaton "wasn't in a delirium tremens state, and he was, you know, pretty stable . . . ." *Id*. at 58.

There is no record evidence that Deaton's condition was different than Dr. Sutton described. But Plaintiffs have offered the affidavits of two experts who both opined as follows:

> The reasonably prudent, minimally competent, general practitioner cannot disregard the potential for these conditions to cascade within hours into a critical life-threatening condition as occurred here. Once the patience reaches stages of delirium, confusion and irrationality, the patient is in a life-threatening stage. . . . In the care and treatment of alcohol withdrawal, all reasonably prudent minimally competent medical practitioners know that the standard of care required routine monitoring, no less than every 8 hours of the vital signs, symptoms and fluid intake of the patient.

Stein Aff. at 9; Riddick Aff. at 10. As previously noted, breaching the standard of care is different than acting with deliberate indifference. *Gobert*, 463 F.3d at 346. And the opinions stop short of saying that the "potential" cascade had actually begun when Dr. Sutton saw Deaton. Stein Aff. at 9; Riddick Aff. at 10.[1] Thus, there is simply no record evidence suggesting that Deaton was in a delirium tremens state when Dr. Sutton saw him.

Although Dr. Sutton saw no current need to treat DTs, he did provide other treatment. For example, Dr. Sutton reviewed Deaton's chart, vital signs, and blood pressure; examined the patient; took his pulse; listened to his heart and lungs; checked his eyes and ears; and ordered

---

[1] The cascade was apparently underway on the morning of December 18, but that was approximately 24 hours after Dr. Sutton saw Deaton, and as Plaintiffs' experts state, the escalation can occur "within hours." Stein Aff. at 9; Riddick Aff. at 10.

irrigation of ear wax to improve his hearing. Dr. Sutton also prescribed Hydrochlorathiazide, a blood-pressure medication, and secured Deaton's written consent to obtain a complete list of his medication from his pharmacy. Dr. Sutton ordered that blood be drawn and various tests conducted, including a "Chem 7," which would have indicated Deaton's kidney function. *Id*. at 54–55.[2] Finally, Dr. Sutton made a visual examination and noted some "abrasion and ecchymosis" on Deaton's right arm at the elbow. *Id.* at 45, 47.

Comparing these facts to those in other cases demonstrates that Plaintiffs have not met the "extremely high standard" of showing deliberate indifference. *Gobert*, 463 F.3d at 346 (citation omitted). For example, in the typical case where deliberate indifference is found, the health-care providers refused or delayed treatment for reasons other than medical judgment. *See*, *e.g.*, *Loosier v. Unknown Med. Doctor*, 435 F. App'x 302, 306 (5th Cir. 2010) ("[d]octor chose not to provide him any treatment or medication for his [neck] injury because of his prisoner status, not some medical judgment"); *Perez v. Anderson*, 350 F. App'x 959, 961–62 (5th Cir. 2009) (holding that an inmate stated a deliberate indifference claim against prison officials who knew he was in excruciating pain and failed to provide him medical treatment); *Easter v. Powell*, 467 F.3d 459, 463–64 (5th Cir. 2006) (nurse allegedly returned plaintiff to cell without prescribed heart medicine because pharmacy was closed); *Harris v. Hegmann*, 198 F.3d 153, 154–55, 159–60 (5th Cir. 1999) (plaintiff alleged that a doctor and two nurses disregarded "his urgent and repeated requests for immediate medical treatment for his broken jaw and his complaints of excruciating pain" over the course of a week).

---

[2]Deaton later presented to the hospital in renal failure.

At the other end of the spectrum are those cases finding no deliberate indifference where doctors exercise medical judgment but "incorrectly diagnosed [the] illness." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) (affirming summary judgment).  As the Fifth Circuit has often stated, deliberate indifference is "something more than a medical judgment call, an accident, or an inadvertent failure." *Murrell v. Bennett*, 615 F.2d 306, 310 n.4 (5th Cir. 1980). And whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97 (1976).  Thus, "the 'failure to alleviate a significant risk that the official should have perceived, but did not' is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (reversing denial of summary judgment) (citing *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)).

The Fifth Circuit has repeatedly applied these standards in rejecting claims of deliberate indifference.  *See*, *e.g.*, *Pryer v. Walker*, 385 F. App'x 417, 417–18 (5th Cir. 2010) (affirming dismissal); *Lewis v. Evans*, 440 F. App'x 263, 265 (5th Cir. 2011) (affirming summary judgment where doctor exercised medical judgment in refusing to proscribe medication that two nurses had recommended); *Davis v. United States*, 358 F. App'x 537, 539 (5th Cir. 2009) (affirming dismissal where plaintiff claimed that defendants "'ignored' his scheduled therapy appointments"); *Fails v. DeShields*, 349 F. App'x 973, 976 (5th Cir. 2009) ("Deliberate indifference is especially hard to show when the inmate was provided with ongoing medical treatment."); *Irby v. Cole*, 278 F. App'x 315, 316 (5th Cir. 2008) ("The record suggests that the defendants may have been negligent in their diagnosis and treatment of Irby.  However, the defendants's actions do not rise to the level of a constitutional violation."); *Garrett v. Univ. of*

*Tex. Med. Branch*, 261 F. App'x 759, 760 (5th Cir. 2008) (finding no deliberate indifference despite alleged misdiagnosis and incorrect treatment because plaintiff failed to prove "the defendants intentionally treated him incorrectly"); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (affirming dismissal where plaintiff alleged that incorrect accommodation of medical condition caused additional injury and holding that "mistaken" judgment does "not amount to deliberate indifference").

There are many other examples, but *Wakat v. Montgomery County*, provides a closer factual fit. 471 F. Supp. 2d 759 (S.D. Tex. 2007). There, the detainee (Mitchell), exhibited symptoms for full-blown DTs, and prison officials noted that he was incoherent and in detox. When Mitchell saw the defendant doctor (Gurol), he told him, "I'm not really here right now, they killed me last night. I was shot in the head 3 times and then they poured gasoline on me and set me on fire." *Id*. at 763. But the doctor "saw no signs of withdrawals from alcohol or benzodiazepine," and instead diagnosed Mitchell as having undifferentiated schizophrenia. *Id*. He therefore set a follow-up appointment in ten days. Before that occurred, prison officials called the doctor to express concern that Mitchell was still in detox. At that point, the doctor diagnosed Mitchell has having late stage DTs and treated the condition, but Mitchell died. The District Court dismissed the claim for the following reasons:

> Far from showing that Gurol was indifferent to Mitchell's condition, the evidence shows that he responded with the medical care he deemed appropriate each time he was alerted to Mitchell's problems. . . . Gurol had his appointment with Mitchell on the morning of March 20, at which time he diagnosed Mitchell with undifferentiated schizophrenia. In his professional opinion he saw no signs of withdrawals from benzodiazepine. Instead, he looked at the symptomology presented to him and made a diagnosis. The fact that his diagnosis was incorrect is tragic, but not deliberately indifferent. He did not ignore Mitchell's complaints. The plaintiffs have shown the court no evidence that Gurol intentionally treated Mitchell for undifferentiated schizophrenia while knowing

9

> that, in fact, Mitchell was suffering dangerous withdrawals from a prescription drug to which he was addicted. None of Gurol's actions show a "wanton disregard" for Mitchell's medical needs. He may have been wrong in his diagnosis, but he did diagnose. His reactions to the information he was given might have been wrong, but they were actions. "There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help." *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979)

471 F. Supp. 2d at 770–71 (internal record citations omitted). The Fifth Circuit affirmed in an unpublished opinion stating, "we are in complete agreement with the rulings of the district court and the reasons and reasoning supporting those rulings; and we can see no reason for writing substantively, as our doing so would merely replicate the writing of the district court." *Wakat v. Montgomery Cnty. Tex.*, 246 F. App'x 265 (5th Cir. 2007).

Returning to Dr. Sutton, it is undisputed that he provided some level of care to Mr. Deaton and attempted to treat his hypertension—the only complaint Deaton made to Dr. Sutton. Like the doctor in *Wakat*, Dr. Sutton did not recognize a need to treat or otherwise manage Deaton for DTs. But "the failure to alleviate a significant risk that the official should have perceived, but did not is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (citation and internal quotation omitted). Perhaps Dr. Sutton's assessment of Deaton was incorrect, constituting negligence or medical malpractice, but Plaintiffs have not presented evidence to meet the high standard of deliberate indifference. Therefore, their claim against Dr. Sutton is due to be dismissed.

IV.  Conclusion

The Court has duly considered the parties' arguments and submissions. Those not addressed herein would not alter the ruling. For the reasons stated, Defendant's Motion for

Summary Judgment [283] is granted. As a result, Defendant's motions in limine [329, 331, and 332] are deemed moot.

**SO ORDERED AND ADJUDGED** this the 6th day of February, 2012.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE